H. R. Hanover, M. Hanover v. Commissioner.
H. Hanover v. Commissioner
Docket Nos. 3930, 3931.
United States Tax Court
1945 Tax Ct. Memo LEXIS 85; 4 T.C.M. (CCH) 882; T.C.M. (RIA) 45287; September 11, 1945
*85 Where the petitioners and others, as tenants in common of undivided interests in oil and gas leases, arranged for the development and management of their property through agreements with agents whose powers and authority were expressly delegated and fixed in advance by the agreements, held, that no association taxable as a corporation was thereby constituted, and respondent erred in his determination of deficiencies in so far as they resulted from adjustments of the income of petitioners with regard to the leases involved. David Hanover, Esq., for the petitioners. Frank M. Thompson, Jr., Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax for the calendar year 1940, in the amount of $51.53 against the petitioner, H. R. Hanover, and $49.94 against the petitioner, M. Hanover. The deficiency against H. R. Hanover results wholly from the elimination from his income of amounts reported by him as his distributable share of net profits of the Golden Eagle Oil Company and the restoration to his income of deductions claimed by him as his distributable share of the net loss of the Silver Eagle Oil *86 Company. The deficiency against M. Hanover results only in part from similar adjustments, and another adjustment as to him is not in controversy. Respondent's action was based on his determination that each "company" was an association taxable as a corporation. The two causes were consolidated. Findings of Fact The petitioners are residents of Shelby County, Tennessee. In 1935 a group of men purchased and acquired title in the name of three trustees, David Hanover, Henry E. Lewis, and Morris Hanover, to an oil lease comprising fifteen acres near Overton, in Rusk County, Texas, and each of the group invested according to the amount of the interest held by him. This lease was known as the Golden Eagle Lease. Subsequently, two oil wells were drilled on the property. The lease was operated for the balance of 1935 and through the succeeding years, including 1939, under the trust agreement naming the three trustees. In 1937 the Silver Eagle Oil Company was organized and an oil lease of fifteen acres in Rusk County adjacent to the Golden Eagle Lease was purchased, title thereto being taken in the names of David Hanover, Henry Lewis, and I. Edwin Hanover, as trustees. A trust agreement *87 was executed similar to the agreement with regard to the Golden Eagle Lease and the lease was similarly operated. Some, but not all of the owners of the Golden Eagle Lease, purchased interests in the Silver Eagle Lease. The names, Golden Eagle Oil Company and Silver Eagle Oil Company were used as trade names for the purpose of identifying the two leases. The petitioners owned interests in both leases, H. R. Hanover owning a 4/110 interest in the Golden Eagle Lease and a 1/12 interest in the Silver Eagle Lease. M. Hanover owned a 1/11 interest in the Golden Eagle Lease and a 1/12 interest in the Silver Eagle Lease. Under date of January 1, 1940, the trustees holding title to both oil leases conveyed and assigned fractional interests therein to the petitioners and other holders of beneficial interests therein, who by the same instrument executed power of attorney in favor of the assignors. The assignment and power of attorney relative to the Golden Eagle Oil lease was, in material part, as follows: "KNOW ALL MEN BY THESE PRESENTS: "That Henry E. Lewis, David Hanover and Morris Hanover Trustees, hereinafter called the Assignor and operating under the trade name of The Golden *88 Eagle Oil Company, for and in consideration of the sum of Ten ($10.00) Dollars and other good and valuable considerations cash in hand paid, receipt of which is hereby acknowledged, has granted, bargained, sold, conveyed, transferred and assigned, and by these presents does grant, bargain, sell, convey, transfer and assign unto Henry E. Lewis, Julius Lewis, Morris Hanover, Joseph Hanover, David Hanover, William G. Artman, Harry Fortas, I. Edwin Hanover, A. Everett Hanover, and Harry Hanover, hereinafter called Assignees, or their heirs or assigns, an interest in and to a seven-eighths (7/8) oil and gas lease and leasehold estate created thereby in the percentage set out after their respective names as hereinafter shown, covering the following described land in the Dance Survey, Rusk County, Texas, to-wit: [Here follows description of land] "The interest assigned to each Assignee is as follows: Percent
Interest
Henry E. Lewis
21/110
Julius Lewis
21/110
Morris Hanover
10/110
Joseph Hanover
12 1/2/110
David Hanover
12 1/2/110
William G. Artman
11/110
Harry Fortas
10/110
I. Edwin Hanover
4/110
A. Everett Hanover
4/110
Harry Hanover
4/110
*89 "Together with the same interest in the two wells now producing on said property, said wells being drilled to the depth of the woodbine Sand and fully equipped for pumping their production in the tanks, including the tanks and all equipment now on said lease. "The Assignors, their successors and assigns, bind and obligate themselves to produce the oil and or gas from the above described property to the best of their ability, without expense to the Assignees except such expense as is herein recited, to pay the expense of operation, to sell and market the oil and or gas on said property for the best available price, to render monthly statements to said Assignees of the oil and or gas sold and marketed with a statement of any expense against same and disburse to the Assignees, their pro rata part of the proceeds after deducting tax or taxes or other expense as shown by statement and chargeable against Assignees' interest in said leasehold estate or products sold therefrom. "The Assignees above named, whether one or more, do hereby make, constitute and appoint the Assignors, the said Henry E. Lewis, David Hanover and Morris Hanover, Trustees, their true and lawful agents and Attorneys *90 in Fact to act for them in their name and stead in managing and operating said property; in caring for and marketing the oil and or gas that may be produced therefrom to the best advantage and for the best available prices; and further authorize and empower said Assignors to enter into any contract or contracts that may be essential or necessary to produce and market said oil and or gas; to sign division orders, transfer orders, or other instruments that may be required by pipe line companies or other producers of said oil and or gas in order to effect payment therefor; to collect the proceeds of said oil and or gas so sold; to issue such receipts as may be required by purchasers of such products, empowering and authorizing said Assignors with full power and authority in the management of said property; to produce oil and or gas from said property; to market same and collect for it, hereby ratifying and confirming each and every act of said Attorney in Fact so lawfully done in the premises, but it is distinctly understood, however, that said Assignors are not given and shall not be given the right or power to sell or mortgage the said Assignees' interest in said property at any time. *91 "Said Assignees further agree that their pro rata part of the tax or taxes against said property and or against the products sold therefrom, may be paid by Assignor and deducted from Assignees' pro rata part of the proceeds of oil and or gas so sold and collected for. "This assignment is effective as of 12:01 A.M. January 1, 1940. "Any agreement between said parties existing prior to the execution of this instrument are now declared to be null and void, cancelled and of no effect as of the time and date aforesaid. "The said William G. Artman, one of the aforesaid Assignees, has heretofore, on the… day of April, 1938, executed an assignment in favor of the Union Planters National Bank & Trust Company of Memphis, Tennessee, all his right, title and interest in and to said oil lease and also all his right, title and interest in and to any benefits to which his pro rata share, to-wit, an 11/110 interest as aforesaid, may be entitled to at that time or at any future time; and the said Assignors, Henry E. Lewis, Morris Hanover and David Hanover, do recognize and have accepted notice of said assignment and do hereby expressly reserve the right to carry out the terms of said assignment *92 and pay over to the Union Planters National Bank and Trust Company of Memphis, Tennessee, subject to the terms of this agreement executed this 1st day of January, 1940, the net proceeds that the said William G. Artman would have been entitled to had he not executed said assignment to the said Union Planters National Bank & Trust Company." A similar instrument was executed on the same date by the trustees and interest holders of the Silver Eagle oil lease, including petitioners, the only differences in the provisions of the instrument being: the names of some of the "assignees," the names of the attorneys in fact which, in the "Silver Eagle" were Henry E. Lewis, I. Edwin Hanover, and David Hanover; the description of the leased land; the fractional interests transferred and held; and the fact that in the instrument covering the Silver Eagle oil lease there was no reference to any hypothecation by any interest owner of his interest in the lease. Both instruments were duly acknowledged and recorded. Henry E. Lewis, one of the attorneys in fact in both instruments and an interest owner in both leases, died September 5, 1941, leaving a will by which 3/4 of his lease interests were given *93 to his wife, and 1/4 to his sister. The will was duly probated and the wife and sister, on September 15, 1943, executed two powers of attorney designating David Hanover, I. Edwin Hanover, and Julius Lewis as their attorneys in fact as respects their interests in both leases. By one of the same instruments the Union Planters National Bank & Trust Company, of Memphis, Tennessee, appointed the same attorneys in fact to handle its interest in the Golden Eagle Lease acquired by the bank through foreclosure of William G. Artman's interest which had been pledged with the bank as collateral to a loan. On August 3, 1942, the assignees and owners of the beneficial interests in the Golden Eagle Lease, including petitioners, revoked the power of attorney granted Morris Hanover in the instrument of January 1, 1940 and appointed I. Edwin Hanover to serve in his place. They also appointed Julius Lewis to serve in the place of Henry E. Lewis who had died. On the same date, the assignees and owners of the beneficial interests in the Silver Eagle Lease, including petitioners, executed power of attorney appointing Julius Lewis to succeed Henry E. Lewis, deceased. Julius Lewis, holder of 21/110 per *94 cent interest in the Golden Eagle Lease, 10 1/2/110 per cent of which he was holding in trust for his brother, Samuel Lewis, on December 20, 1943, assigned the 10 1/2/110 per cent interest to the trustees under the will of Samuel Lewis who had died. These trustees then, on the same date, executed a power of attorney to David Hanover, I. Edwin Hanover, and Julius Lewis as attorneys in fact respecting said 10 1/2/110 per cent interest. The authority granted the attorneys in fact in the powers of attorney mentioned in the three immediately preceding paragraphs was the same in all material respects as that granted the attorneys in fact in the instrument of January 1, 1940. Since January 1, 1940 the attorneys in fact named in the respective instruments have confined themselves exclusively to the powers granted them thereunder. They have collected the proceeds from the sale of oil, paid the current operating expenses, and distributed the profits to the owners of the lease interests when profits became available. No meetings of the interest holders have been held and they have never been called on for advice. The bank accounts were held in the names of the respective groups of attorneys *95 in fact and of the Golden Eagle Oil Company and Silver Eagle Oil Company. Every month the attorneys in fact sent the individual interest owners statements showing the operations for the month of both leases as a whole. The profit or loss of each individual was shown, his particular income from his interest in the lease was shown, and the amount of his share of the expense and profits, if any, was shown. If there was a loss, the amount the individual interest owner was called upon to pay in to cover such loss was stated. An annual profit and loss statement was issued covering each of the leases, showing the income of each interest owner and his itemized amount of the expenses. The Golden Eagle Lease paid a profit in 1940, but the Silver Eagle Lease was operated at a loss in that year, so that the attorneys in fact called upon the various interest owners for additional funds. The Silver Eagle Lease did not pay a profit until late in 1941. The distributable shares of the net profits of the Golden Eagle Oil Company received by petitioners were not received as distributions from that company as an association taxable as a corporation. The petitioners' pro rata share of the net losses *96 from the operations of the Silver Eagle Oil Company, claimed by them as deductions from gross income, were not losses occasioned by the operations of an association taxable as a corporation. Opinion TYSON, Judge: The underlying issue involved is whether the circumstances under which the Golden Eagle and the Silver Eagle oil leases were developed, managed, and operated were such as to constitute their being engaged in business as associations. If they were so engaged the deficiencies determined against the petitioners herein must be approved. The decisive principles of law are stated in , where, in holding that an organization was an association taxable as a corporation, the Supreme Court considered the following factors as controlling: (1) title in the association to the property held by the entity; (2) centralized management; (3) continuity of existence; (4) transferability of beneficial interests without affecting the continuity of the enterprise and (5) limitation of the personal liability of participants to the property embarked in the undertaking. Some of the factors included by the Court among those as controlling in the *97 Morrissey case are absent here. The parties here designed in the various instruments as "agents and Attorneys in Fact" held no title to the fractional interests in the leases, that title being in the owners and holders of such interests as tenants in common of realty. ; . There was no centralized management, except such as was "achieved by powers of attorney executed by each holder, not by election". There was no continuity of existence as regards the operations of the enterprises by the "agents and Attorneys in Fact", since upon the death of an interest holder one receiving such interest by reason of such death was free to appoint other "agents and Attorneys in Fact", and this was done in one instance upon the death of Henry E. Lewis. Also, the respective interests might be disposed of by the holders thereof and the party acquiring same could appoint other agents and attorneys in fact to represent such interest, and even if interests were retained by the original holders they could *98 appoint other agents and attorneys in fact in lieu of those originally appointed, and this was also done in one instance where petitioners and other interest holders revoked a power of attorney and appointed another "agent and Attorney in Fact". Also, there was no limitation upon the personal liability of the interest holders since the various instruments provide, in addition to the broad provisions of management entrusted to the "agents and Attorneys in Fact", that they could "enter into any contract or contracts that may be essential or necessary to produce and market said oil and or gas". See . We think it is obvious that the absence herein of the enumerated factors which existed in the Morrissey case would not justify a holding under authority of that case, that the two enterprises, or either of them, constituted an association taxable as a corporation. Of the cases decided since the Morrissey case the determinative facts in ; cert. denied, , closely, if not completely, parallel those in the instant case. The business there considered *99 was held not to be an association taxable as a corporation. The determinative facts there present are present here. Here, as in that case, various parties, by assignment, acquired and held fractional interests in an oil lease. Here, as there, under the provisions of the assignment, the assignors contracted to operate, market, manage, and account for the proceeds of the oil produced from the leased premises, and to pay the net earnings of the enterprise periodically to the various interest holders as that interest appeared. Here, as there, the interest holders executed in favor of the assignors a power of attorney empowering the assignors to act for and on behalf of the interest holders in matters relating to the property thereby vesting the management and control of the property in the attorneys in fact, except that here the attorneys were expressly forbidden to sell or mortgage such property, while there such latter provision was not contained in the power of attorney. Here, as there, no provision was made for perpetuating the management as created by the instrument or for the succession of agents and attorneys in fact. Here, as there, the interests acquired through the assignment *100 were readily transferable by reassignment. Here, as there, there is no limitation on the personal liability of the interest holders. Here, as there, the enterprise was operated in the manner prescribed in the written assignment and powers of attorney. See also ; ; ; and . In view of , and the other cases just above cited, we are of the opinion that the relations between the interest holders, including the petitioners, and the parties named in the various instruments as "agents and Attorneys in Fact" were those of principal and agent. Respondent cites ; ; ; . We think each of the above cited cases is distinguishable on material facts. In , *101 the court found that there was a purpose to limit the liabilities of the respective shareholders. Also, the court stated: "This was not any ordinary trust. The title to the property, as far as the percentage shareholders were concerned, was in a single person denominated trustee." Such circumstances are not present here, since the title to the property was in the various interest holders and "they were severally liable for expenses of producing, saving, and marketing the output of the wells to the extent" that their attorney in fact "acted within its authority." . In , title to the lease was held by the trustees for the participating interest holders, and the trustees had the power to sell the leasehold at any time for any amount they saw fit. These facts do not exist here. Title to the lease involved here was in the interest holders and not in the "agents and Attorneys in Fact," and the written instrument under which the business was operated expressly stated that the "agents and Attorneys in Fact" "are not given and shall not be given the right or power to sell or mortgage *102 the said Assignees' [interest holders'] interest in said property at any time." In , the court expressly distinguished the Horseshoe Lease and Rector & Davidson cases in that in the latter cases, as here, "there was no arrangement * * * to insure continuity of the centralized management." There are further distinctions between the Fortney and instant cases. In the Fortney case "an assignee could not withdraw from either of the ventures without loss of his interest in the particular leasehold involved," the agreement expressly providing "that failure to pay a proportionate share of any assessments necessary for the continuation of development would result in reversion to the assignors of the assignee's interest in the undrilled portion of the property," while here there is no provision in the agreements which restricts the rights of an interest holder to withdraw from the venture without forfeiting any part of such interest. In the Fortney case, "Transfer of an assignee's interest to a successor or assign would not affect the continuity of the ventures," while here, transfer of such an interest could affect the continuity *103 of the venture, since upon such transfer the transferee could himself control and manage such interest or could appoint agents and attorneys in fact other than the original agents and attorneys in fact to do so, thus withdrawing the control and management of such interest from the enterprise as originally organized. Also, in the Fortney case, the control and management of the various interests by the "trustee" as agreed upon was to continue throughout the life of the agreement, while here, control and management in the designated agents and attorneys in fact was to continue only at the will of each interest holder since the original power of attorney could be revoked at will by such holder. In , the lease was held in the name of an operating trustee, continuity was assured by a provision for a successor trustee and by a provision that the trust should continue in force "so long as the properties owned by the Trust shall continue to be operated"; and the liability of the fractional interest holders was limited to the amount they had contributed to the trust. None of these significant facts is present here, since (1) title, here, *104 was held in the names of the holders of the fractional interests and not in a trustee or in the names of the attorneys in fact, (2) there is no provision in the instrument here involved for a successor to the attorneys in fact, or either of them, and (3) the liability of the interest holders was not limited to the amount they had contributed to the venture, but [they] were severally liable for expenses of producing, saving, and marketing the output of the wells to the extent that their attorneys in fact acted within their authority. Cf. We hold that neither the Golden Eagle Company lease nor the Silver Eagle Company lease was, during the taxable year, an association taxable as a corporation. We hold as a necessary consequence, that the respondent erred in his determination of deficiencies in so far as they resulted from adjustments of the income of petitioners with regard to those leases. Decision will be entered in Docket No. 3930 for petitioner, and in Docket No. 3931 under Rule 50.